UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION
IN ADMIRALTY

---------------------------------------------------------------------------x

GREAT AMERICAN INSURANCE COMPANY OF NEW YORK, QBE SEGUROS, UNIVERSAL INSURANCE COMPANY, CERTAIN UNDERWRITERS AND INSURERS AT LLOYDS OF LONDON SUBSCRIBING TO POLICY OF INSURANCE PC142719000, CERTAIN UNDERWRITERS AND INSURERS AT LLOYDS OF LONDON SUBSCRIBING TO POLICY OF INSURANCE LC151592500, CERTAIN UNDERWRITERS AND INSURERS AT LLOYDS OF LONDON SUBSCRIBING TO POLICY OF INSURANCE LC1516254000, CERTAIN UNDERWRITERS AND INSURERS AT LLOYDS OF LONDON SUBSCRIBING TO POLICY OF INSURANCE PC1412443000, CERTAIN UNDERWRITERS AND INSURERS AT LLOYDS OF LONDON SUBSCRIBING TO POLICY OF INSURANCE LC1515551000, CERTAIN UNDERWRITERS AND INSURERS AT LLOYDS OF LONDON SUBSCRIBING TO POLICY OF INSURANCE DC1500194000, CERTAIN UNDERWRITERS AND INSURERS AT LLOYDS OF LONDON SUBSCRIBING TO POLICY OF INSURANCE DC1500466000, CERTAIN UNDERWRITERS AND INSURERS AT LLOYDS OF LONDON SUBSCRIBING TO POLICY OF INSURANCE LC1515422000, CERTAIN UNDERWRITERS AND INSURERS AT LLOYDS OF LONDON SUBSCRIBING TO POLICY OF INSURANCE LC1516397000,

Case No.: 3:17-cv-554-TJC-MCR

Plaintiffs,

-against-

STORMGEO CORP., INC. D/B/A APPLIED WEATHER TECHNOLOGY,

Defendant.

---------------------------------------------------------------------------x

**AMENDED
COMPLAINT**

1

Plaintiffs Great American Insurance Company of New York, QBE Seguros, Universal Insurance Company, and Certain Underwriters and Insurers at Lloyds of London Subscribing to Policy of Insurance PC1412719000, Certain Underwriters and Insurers at Lloyds of London Subscribing to Policy of Insurance LC151592500, Certain Underwriters and Insurers at Lloyds of London Subscribing to Policy of Insurance LC1516254000, Certain Underwriters and Insurers at Lloyds of London Subscribing to Policy of Insurance PC1412443000, Certain Underwriters and Insurers at Lloyds of London Subscribing to Policy of Insurance LC15155510000, Certain Underwriters and Insurers at Lloyds of London Subscribing to Policy of Insurance DC1500194000, Certain Underwriters and Insurers at Lloyds of London Subscribing to Policy of Insurance DC1500466000, Certain Underwriters and Insurers at Lloyds of London Subscribing to Policy of Insurance LC1515422000, and Certain Underwriters and Insurers at Lloyds of London Subscribing to Policy of Insurance LC1516397000 (collectively "Plaintiffs"), by their undersigned counsel, Horr Novak and Skip PA and Maloof Browne & Eagan LLC, allege the following upon information and belief, and each one is the alternative, as and for their Complaint against StormGeo Corp., Inc. d/b/a Applied Weather Technology (hereinafter Defendant or "AWT"):

## NATURE OF THE ACTION

1.      This is an action in Admiralty and Product Liability arising out of the negligence and strict liability of AWT in providing weather forecasting products to Sea Star Line LLC, d/b/a Tote Maritime Puerto ("Sea Star" or "Tote") and/or its affiliates used aboard the EL FARO leading up to and at the time of the sinking of the S.S. EL FARO on October 1, 2015.

## PARTIES

2.      Plaintiff Great American Insurance Company of New York ("Great American") was and is now a marine insurance underwriter incorporated under and by virtue of the laws of New York.

3.      Plaintiff QBE Seguros ("QBE") was and is now a marine insurance underwriter incorporated under and by virtue of the laws of Puerto Rico.

4.      Plaintiff Universal Insurance Company was and now is a marine insurance underwriter incorporated under and by virtue of the laws of Florida.

5.      Plaintiffs Certain Underwriters and Insurers at Lloyds of London Subscribing to Policy of Insurance PC1412719000 are a group of marine insurance underwriters based in the United Kingdom, who along with QBE, insured and/or re-insured cargos owned, shipped by and/or consigned to Century Packing Corp and Pet Plastics LLC.

6.      Plaintiffs Certain Underwriters and Insurers at Lloyds of London Subscribing to Policy of Insurance LC151592500 are a group of marine insurance underwriters based in the United Kingdom, who along with QBE, insured and/or reinsured cargos owned, shipped by and/or consigned to Able Sales Company.

7.      Plaintiffs Certain Underwriters and Insurers at Lloyds of London Subscribing to Policy of Insurance LC1516254000 are a group of marine insurance underwriters based in the United Kingdom, who along with QBE, insured and/or reinsured cargos owned, shipped by and/or consigned to Mendez & Company, Inc.

8.      Plaintiffs Certain Underwriters and Insurers at Lloyds of London Subscribing to Policy of Insurance PC1412443000 are a group of marine insurance underwriters based in the United Kingdom, who along with QBE, insured and/or reinsured cargos owned, shipped by and/or consigned to Puerto Rico Supplies Group, Inc.

3

9.      Plaintiffs Certain Underwriters and Insurers at Lloyds of London Subscribing to Policy of Insurance LC1515551000 are a group of marine insurance underwriters based in the United Kingdom, who along with QBE, insured and/or reinsured cargos owned, shipped by and/or consigned to Suarez and Company.

10.     Plaintiffs Certain Underwriters and Insurers at Lloyds of London Subscribing to Policy of Insurance DC1500194000 are a group of marine insurance underwriters based in the United Kingdom, who along with QBE, insured and/or reinsured cargos owned, shipped by and/or consigned to Dade Paper & Bag Co.

11.     Plaintiffs Certain Underwriters and Insurers at Lloyds of London Subscribing to Policy of Insurance DC1500466000 are a group of marine insurance underwriters based in the United Kingdom, who along with QBE, insured and/or reinsured cargos owned, shipped by and/or consigned to Quirch Foods Co.

12.     Plaintiffs Certain Underwriters and Insurers at Lloyds of London Subscribing to Policy of Insurance LC1515422000 are a group of marine insurance underwriters based in the United Kingdom, who along with Universal Insurance Company, insured and/or reinsured cargos owned, shipped by and/or consigned to Plaza Provision Company.

13.     Plaintiffs Certain Underwriters and Insurers at Lloyds of London Subscribing to Policy of Insurance LC1516397000 are a group of marine insurance underwriters based in the United Kingdom, who along with QBE, insured and/or reinsured cargos owned, shipped by and/or consigned to Supermercados Econo, Inc.

14.     Plaintiffs are the duly subrogated insurers and/or reinsurers of the consignees shippers, or owners of the shipments described in Schedule A and bring this action on their own behalves, both directly and through their subrogated rights, and as agent or trustee on behalf of

and for the interest of all parties who may be or become interested in the said shipments, as their respective interests may ultimately appear, and Plaintiffs are entitled to maintain this action.

15.     Upon information and belief, Defendant StormGeo Corp., Inc. d/b/a Applied Weather Technology ("AWT") is a corporation incorporated under and by virtue of the laws of the State of California, with its principal place of business in the United States in California. As set forth in more detail herein, AWT is subject to the jurisdiction of this Honorable Court by, *inter alia*, its numerous contacts with the State of Florida created by AWT, which but for such contacts, this claim would not have arisen.

## JURISDICTION AND VENUE

16.     This case involves issues of negligence and strict liability under Admiralty Law and thereby come within the admiralty and maritime jurisdiction of this Court pursuant to 28 U.S.C. § 1333 and are maritime claims within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure.

17.     Venue is proper in this District because a substantial part of the events or omissions giving rise to the claim occurred within this District and the Vessel sailed from this District on the Voyage.

18.     In addition, this action is legally related to the limitation proceedings in this district and instituted by Sea Star Line in respect of the sinking of the EL FARO (Case No. 3:15-cv-1297-HES-MCR; Case No. 3:16-cv-1197-TJC-JRK).

## FACTS

19.     All of the following facts in this Complaint are asserted upon information and belief. In September of 2015, Plaintiffs and/or their respective insureds shipped or were the owners or consignees of various cargoes shipped on board the S.S. EL FARO (the "Vessel")

from Jacksonville, Florida at approximately 9:30pm EDT on September 29, 2015, with an intended destination of San Juan, Puerto Rico (the "Voyage"), as set forth in Schedule A.

20.     The Captain of the EL FARO adjusted course to the south at approximately 7:01am EDT on September 30, 2015, stating at 8:31am EDT that with the new course "we'll be about sixty miles south of the eye, it should be fine."

21.     The EL FARO encountered Hurricane Joaquin (the "Hurricane") and sank on October 1, 2015, resulting in the total loss of all cargo carried on board, including those cargoes listed in Schedule A.

22.     Defendant  manufactured, distributed and sold the Bon Voyage System version 7 ("BVS 7" or "BVS 7 Product")  to Sea Star Lines, LLC, d/b/a Tote Maritime Puerto Rico ("TOTE"), in Florida, and was likely installed in Florida on March 14, 2014 on the EL FARO. The BVS 7 Product is a desktop application that can be installed on ship or shore computers. Through onboard computers, the BVS 7 Product provides weather data including hurricane positions and projected hurricane tracks to the ship by broadband or email communications in a compressed format.

23.     The EL FARO also was connected to the Inmarsat Fleet Broadband transmission service for hurricane location data, but did not have internet browsing capability.

24.     Upon information and belief, from testimony before the NTSB and other sources, it has been learned that AWT since at least 2011 created the likelihood of numerous additional pertinent contacts with the State of Florida, including, *inter alia*, maintaining an office which serviced or was designed to do sales and service to TOTE and the EL FARO in Miami, Florida; obtaining the primary source of data utilized in the product at issue from the National Hurricane Center located in Miami, Florida; sales and likely service calls to the EL FARO in the State of

Florida; selling its product in the State of Florida, including to Sea Star which has its principal place of business in Jacksonville, Florida and whose vessels (including the EL FARO) were based in Jacksonville, Florida and ran regular routes utilizing the BVS 7 Product carrying cargo from Jacksonville, Florida to Puerto Rico; sending its technicians to the State of Florida in connection with technical support and training its customers in the use of its products; by its sales representatives providing support to Sea Star and/or its vessels (including the El FARO) in Jacksonville, Florida; by sending its product to the EL FARO in Florida (including the BVS 7 in and about March, 2014) and previous versions; by sending training material (including videos) for the instruction and use of its product to its customers in the State of Florida (including Sea Star); by transmitting its weather and routing data to its more than 6,000 commercial vessel customers while they are sailing in Florida ports and/or in Florida waters; and by transmitting its weather and routing data to its many separate yacht customers while they are in Florida ports and/or sailing in Florida waters.

25.     More specifically, the EL FARO has been trading regularly between Jacksonville, Florida and Puerto Rico since at least 2013 and has been utilizing BVS Products since at least 2011. The likelihood is that AWT sent the BVS 7 Product to the Vessel in *Jacksonville, Florida* in and about March 2014 for installation on the Master's computer, and in June 2015 for installation on the Bridge, and a configuration change to the Vessel in March 2014, and hardware (keys) to the Vessel in Jacksonville, Florida in June 2015. While the Vessel was in Jacksonville, Florida and/or while sailing in Florida waters, AWT transmitted weather data on a regular basis, including the voyage at issue. In addition, many of the deficient communications and data described below that were sent to the Vessel on the voyage at issue occurred in or near the Port of Jacksonville or otherwise in Florida waters.

7

26.   The BVS 7 Product was installed onboard the EL FARO, and the BVS 7 regular weather updates were received only in one computer in the EL FARO captain's office near his quarters. The EL FARO received weather data from AWT by email on an automatically recurring basis.

27.   During the Voyage, the Captain viewed screenshots from the BVS 7 indicating significant wave heights, wind speeds, and the position and projected track of the center of Hurricane Joaquin.

28.   Weather data generated by the NOAA Global Forecast System ("GFS") and issued by the National Hurricane Center ("NHC") is alleged to be the primary data used by AWT to create the BVS 7 Product's hurricane location and track data.

29.   The GFS computer models that produce the forecast data used by AWT for the BVS 7 Product are run every six hours and take approximately five hours to complete.  The NHC then takes 4 hours to check the data. After obtaining the GFS data from the NHC, AWT then adds fronts, tides, currents, and then runs the NOAA Wavewatch III model, an additional three hour process. AWT then spends approximately one hour quality controlling the data before emailing it to vessels. Therefore, altogether, AWT's earliest release of the BVS weather files for each six hour time period to the EL FARO occurred at least **nine to thirteen hours** after the observations were made for the GFS computer models.

30.   Put another way, during the Voyage, the data provided by the BVS 7 Product with respect to the center and projected track of the Hurricane was defective, because the readouts consisted of little more than publically available data **from at least nine to thirteen hours earlier** being reproduced and utilized and sold by AWT to its consumers on a highly delayed basis.

31.     The BVS 7 brochure describes this product as one which "provides the most recent weather and ocean data to the ship..." Other BVS website advertising describes its products as providing "Tropical Storm Data ... based on real-time latest available forecasts." But, in fact, at all times during the Voyage, the data provided by the BVS 7 Product was defective in that it provided outdated and erroneous projections of the Hurricane's path, which were erroneous by many miles.

32.     A further delay occurred leading up to the 5:00am EDT transmission of the AWT product on September 30, 2015, when the BVS 7 Product report sent to the EL FARO was identical to the storm position and forecast track e-mailed to EL FARO six hours earlier. AWT admitted to this technical error in a December 13, 2016 letter sent to the National Transportation Safety Board: "In the post-accident analysis it was discovered that the NHC storm track for Joaquin did not update with the BVS 30/0900Z download. Adjustments have been made on the AWT internal processing of tropical cyclones so AWT's Data Team can in the future easily verify that the forecasts have properly updated." This critical technical glitch, said to have occurred because of late processing of the cyclone forecast by someone employed by AWT, created an additional six-hour delay of the already out-of-date information relayed to the vessel at that time, leaving the Captain of the EL FARO Captain Michael Davidson (the "late Captain"), to plan his route at the critical time on the morning of September 30, 2015 off of storm projections that were by this point at least **fifteen to nineteen hours after they were actually observed**.

33.     Major discrepancies therefore existed between the BVS 7 Product maps and the far more current and far more accurate readouts from INMARSAT-C SafetyNET ("Inmarsat"),

the satellite imagery from which BVS sources its information, in the days and hours leading up to the EL FARO sinking.

34.     Typically, unbeknownst to the late Captain, when EL FARO received BVS's reports, there was in actuality often a large difference between the BVS 7 Product Hurricane track projections given to him, and the timelier and more accurate Inmarsat projections of the storm's track and center, with the Hurricane erroneously being shown more northerly than it actually was, by the BVS 7. These discrepancies are set forth in the following graphics created by the NTSB in the "Group Chairman's Final Report" issued by the Meteorology Group in connection with the El Faro investigation on December 13, 2016, which illuminate these discrepancies when the red (Inmarsat) and blue (BVS) predicted hurricane tracks on each of them are compared:



**Figure 58** – Comparison of Joaquin's location and forecast track delivered by BVS main weather files and Inmarsat-C SafetyNET and available to El Faro about 2300 EDT on September 29, 2015. Different-colored cyclone symbols show Joaquin's location from BVS, Inmarsat-C SafetyNET, and best track data. Green dotted line shows El Faro position. Depictions are overlaid on GOES-13 infrared image from 2315 EDT on September 29, 2015. Image is not corrected for parallax error.



**Figure 60** – Comparison of Joaquin's location and forecast track delivered by BVS main weather files and Inmarsat-C SafetyNET and available to El Faro about 0500 EDT on September 30, 2015. Different-colored cyclone symbols show Joaquin's location from BVS, Inmarsat-C SafetyNET, and best track data. Green dotted line shows El Faro position. Depictions are overlaid on GOES-13 infrared image from 0915 EDT on September 30, 2015. Image is not corrected for parallax error.



**Figure 62** – Comparison of Joaquin's location and forecast track delivered by BVS main weather files and Inmarsat-C SafetyNET and available to El Faro about 1100 EDT on September 30, 2015. Different-colored cyclone symbols show Joaquin's location from BVS, Inmarsat-C SafetyNET, and best track data. Green dotted line shows El Faro position. Depictions are overlaid on GOES-13 visible image from 1115 EDT on September 30, 2015. Image is not corrected for parallax error.



*Figure 64* – Comparison of Joaquin's location and forecast track delivered by BVS main weather files and Inmarsat-C SafetyNET and available to El Faro about 1700 EDT on September 30, 2015. Different-colored cyclone symbols show Joaquin's location from BVS, Inmarsat-C SafetyNET, and best track data. Green dotted line shows El Faro position. Depictions are overlaid on GOES-13 visible image from 1715 EDT on September 30, 2015. Image is not corrected for parallax error.



**Figure 66** – Comparison of Joaquin's location and forecast track delivered by BVS main weather files and Inmarsat-C SafetyNET and available to El Faro about 2300 EDT on September 30, 2015. Different-colored cyclone symbols show Joaquin's location from BVS, Inmarsat-C SafetyNET, and best track data. Green dotted line shows El Faro position. Depictions are overlaid on GOES-13 infrared image from 2315 EDT on September 30, 2015. Image is not corrected for parallax error.



**Figure 68** – Comparison of Joaquin's location and forecast track delivered by BVS main weather files and Inmarsat-C SafetyNET and available to El Faro about 0500 EDT on October 1, 2015. Different-colored cyclone symbols show Joaquin's location from BVS, Inmarsat-C SafetyNET, and best track data. Green dotted line shows El Faro position. Depictions are overlaid on GOES-13 infrared image from 0515 EDT on October 1, 2015. Image is not corrected for parallax error.

35.     This NTSB report further found large discrepancies of between 57 and 111 miles between the expected hurricane center portion for 8:00am EDT on October 1, 2015 sent to the EL FARO by the BVS 7 at various times on September 29 and 30, 2015 and the ultimate actual hurricane center position. Given that the late Captain was planning a 60 mile passage outside of the Hurricane's center, these large discrepancies were ultimately very problematic.

## FACTS: PLOTTING THE VESSEL'S COURSE

36.     The late Captain was clearly unaware of the delayed and inaccurate Hurricane locations and projections being proffered by the BVS 7 Product, and thus erroneously relied upon them as current and accurate. Indeed, tragically, so strongly did the late Captain trust the accuracy of the BVS 7 Product, that when, on several occasions the Vessel's mates suggested a change of course, he rejected those suggestions.

37.     Per the attached table, the late Captain downloaded and relied upon each of the BVS 7 Product screenshots within roughly an hour to an hour and a half of their being transmitted by AWT to the Vessel, with the exception of the 2300 screenshot sent on September 30, 2015, sent after the Captain had retired to his cabin, which was not downloaded by him until after he woke up, at 4:45am EDT on October 1, 2015:

| Table 1. BVS email transmissions to *El Faro* during final voyage. | | | | | |
|---|---|---|---|---|---|
| Time BVS Email was Sent from Applied Weather Technologies (EDT) | | Time BVS Email was Available for Download from Inmarsat Globe Email System (EDT) | | Time BVS Email was Downloaded to *El Faro* (EDT) | |
| 29-Sep-2015 | 1702 | 29-Sep-2015 | 1704 | 29-Sep-2015 | 1837 |
| 29-Sep-2015 | 2302 | 29-Sep-2015 | 2304 | 29-Sep-2015 | 2329 |
| 30-Sep-2015 | 0502 | 30-Sep-2015 | 0504 | 30-Sep-2015 | 0608 |
| 30-Sep-2015 | 1102 | 30-Sep-2015 | 1103 | 30-Sep-2015 | 1124 |
| 30-Sep-2015 | 1702 | 30-Sep-2015 | 1703 | 30-Sep-2015 | 1747 |
| 30-Sep-2015 | 2302 | 30-Sep-2015 | 2304 | 1-Oct-2015 | 0445 |
| 1-Oct-2015 | 0502 | 1-Oct-2015 | 0503 | 1-Oct-2015 | 0609 |

38.     Given that the late Captain had announced his intention, and planned his route, to leave only a 60 mile cushion between the Vessel and the Hurricane during this passage, the repeated 40-50 mile (or greater) mapping even by the BVS 7 Product in effect left the EL FARO and the late Captain with no safety margin at all.

39.     A standard marine industry principle for safe travel near tropical storms that is followed by prudent mariners generally requires that in the Northern Hemisphere vessel's steer away from the center and right front (relative to the direction that the storm is travelling) or here northerly, quadrant of storms, and try to stay to the left, or here southerly side of the storm, where significantly lesser winds and sea heights can be expected.

40.     The late Captain so trusted the accuracy of the data provided by the BVS 7 Product and its indication that the Vessel was well on its way to the far safer south side of the Hurricane that he retired to his cabin at roughly 8:00pm EDT on September 30, 2015, stating: "I have the B-V-S new waypoint route sheet ...", and calmly stated at 7:53pm EDT, "fasten your belt till we get in the backside of it." He later reported when he awoke at 4:10am EDT that he had been: "sleepin like a baby."

41.     The late Captain reached the foregoing erroneous conclusion that the Vessel's route would take it sixty miles to the south of the eye of the Hurricane because, as shown in the illustrations above, that was what the BVS 7 Product data, which he trusted and relied upon, was consistently and falsely indicating, while the more timely Inmarsat data, had the late Captain been relying upon that instead, actually indicated to the contrary that even the Vessel's adjusted track would take it to the more dangerous north side of and perilously close to the center of the Hurricane.

42.     The other ships officers, in contrast to the late Captain, looked at another, more accurate forecast, the Inmarsat forecast (known as "SAT-C" forecast), at 5:12-5:13pm EDT, and during that time the Second Mate and the Chief Mate had the following conversation:

**2M**
17:12:40.9     got the latest weather report in from uh SAT-C [Inmarsat]. and uh-
               this is the position now.
17:12:51.5


**CM**
17:12.51.4     really?
17:12:52.2

**2M**
17:12:52.2     and that's where it's going to be and that's we're gunna be at the
               same time.[unintelligible word omitted]
17:12:55.9

**CM**
17:12:55.4     oh.
17:12:56.0

**2M**
17:12:55.9     yes. [happily exclaimed]
17:12:56.9

**CM**
17:12:56.5     maybe we should go back 'round
17:12:58.0

**2M**
17:12:57.4     [sound of laughter] so- yeah. [happily exclaimed]
17:13:00.6

**CM**
17:13:01.0     okay so its...
17:13:02.2

**2M**
17:13:01.1     it's two in the morning.
17:13:02.1

**CM**
17:13:02.3          farther sound and west than the last one.
17:13:05.8


**2M**
17:13:05.7          mhmm. yup. yeah. so it's right on our old trackline.
17:13:09.3


**CM**
17:13:06.9          [unintelligible word omitted] even more south.
17:13:08.9

In contrast to the late Captain, who was relying exclusively upon the accuracy of BVS 7 Product, or who was confused by it, these ships officers thus knew that the Hurricane was "right on our old trackline ... even more south", but they were still unable at various times to convince the late Captain to change course and to *de facto* end his reliance upon the BVS 7 Product.

43.     For example, at 11:05pm EDT the late Captain rejected a request by the late Third Mate, Jeremy Riehm, to change course based upon the Inmarsat map the Mate received just 12 seconds before. Then, again, at 1:20am EDT on October 1, 2015, the Vessel's late Second Mate, Danielle Randolph, suggests that the Vessel take a more southward and safer course through the Crooked Islands, but the late Captain overruled her and insisted that that heading of 116 degrees be taken, which tragically sent the Vessel even more directly into nearly the center of the Hurricane. As shown in the diagram below, the Captain's 116 degree course appears likely to take the Vessel to the south of the Hurricane's center based upon the BVS 7 Product's erroneous and outdated depiction of the Hurricane's route. But, in fact it put the Vessel on a direct collision course with the far more accurate Inmarsat depiction – red hurricane center icon – as well as the National Hurricane Center's "advisory" – in purple – and "best track"/after the fact – in black – hurricane center positions:



*Note: Course change at 01:24. 2M had called Capt. & wanted to head South but he was told to stick with 116 deg.

44.    That is why it was also so tragic when the late Captain, utilizing BVS' most recent but defective data, provided by the BVS 7 Product six hours earlier at 11:00pm EDT on September 30, 2015, repeatedly and erroneously opined that the Vessel was going to pass south of the Hurricane, when the ship was in fact already (unbeknownst to him) on a collision course with the more dangerous eyewall of the Hurricane, and on its more dangerous the north side.

45.    Relying almost entirely then upon the false data provided by the defective BVS 7 Product, or being confused by it, the late Captain still erroneously believed even after he awoke at approximately 4:00am EDT on October 1, 2015 – just over three and a half hours before the last conversation recorded on the Vessel's Voyage Data Recorder ("VDR"), when the Vessel evidently sank – that the Vessel was going to pass south of the center of the Hurricane, when the Vessel was in fact approaching the eyewall of the Hurricane on its more dangerous north side.

46.     Thus, at 4:24am EDT on October 1, 2015, relying upon the erroneous data provided by the defective BVS 7 Product, the late Captain stated: "we won't be goin' through the eye."

47.     Again, the late Captain was relying upon the erroneous data provided by the defective BVS 7 Product to the exclusion of other data to determine the Hurricane's position and route, resulting in the late Captain stating at 5:03am EDT on October 1, 2015:  "That - that's fine - but here's the thing - you got two G-P-Ss - you got five G-P-Ss - you gunna get five different positions. You got one weather program [and I use/and use] B-V-S and that's what I [sent] up here…"

48.     The late Captain in fact, indicated that he was confused by the discrepancy between the false data provided by the defective BVS 7 Product, and other more timely and accurate weather data accessed by the Vessel's officers, stating next, also at 5:03am EDT on October 1, 2015: "we're getting conflicting reports as to where the center of the storm is."

49.     Thus, again, at 5:06am EDT and 5:18am EDT, on October 1, 2015, respectively, relying upon the erroneous data provided by the defective BVS 7 Product, the late Captain erroneously told the late Chief Mate, Steven Shultz, on the Vessel: "now we're on the back side of the storm," and then "only gunna get better from here ... we're on the back side of it," when in fact the Vessel was on the dangerous north side of and approaching the eyewall of the Hurricane and the conditions were about to get even worse.

50.     At 5:22am EDT the late Captain further confirmed both his misconception of the location of the Vessel, which he erroneously thinks is headed over to the south side of the Hurricane, and his pure reliance on the entirely erroneous BVS data, when he adds: "[I] figured it would be really [explicative deleted] between two and eight o'clock ... that's what's forecast on

the B-V-S that's [our] weather system so we're going ... [get on the other side/be around the south side]."

51.     Furthermore, the anemometer on the EL FARO may not have been fully functioning during the Voyage, leaving him fully reliant upon the BVS 7 Program. The late Captain thus stated concerning the anemometer at 7:14am EDT on September 30, 2015: "I wouldn't trust it" and later on October 1, 2015 5:10am EDT in response to the question: "What's the wind speed?" stating "we don't know. We don't have [any] anemometer." Without a working device to gauge wind-speed, the late Captain chose to rely almost solely on the information from the BVS 7 to make decisions on where to navigate.

52.     The lack of urgency by the late Captain throughout the morning of October 1, 2015 further reflected the fact that he so strongly relied upon and trusted the BVS 7 Product's hurricane position and track data to be accurate and to put him safely on the south side of the Hurricane.

53.     Unfortunately, relying upon his erroneous belief in the technological prowess of the BVS 7 Product's data, the late Captain and the Vessel proceeded nearly directly into the center of the Hurricane at the brisk and ultimately fatal speed of an estimated 20 knots.

54.     Ultimately, relying upon the defective BVS 7 Product, or being confused by it, and despite the fact that the late Captain had virtually the entire Atlantic Ocean to his East, the late Captain steered the vessel directly into nearly a bullseye hit in the center of the Hurricane, as reflected in the following graphic, which depicts the location of the Vessel's last location, having sailed nearly into  the  Hurricane's eye:



**Figure 37** – *DMSP OLS visible image near 0800 EDT on October 1, 2015. Green line marks El Faro track through accident time.*

55.     Stating at 4:40am EDT, the late Captain began receiving complaints from the late Chief Engineer, Richard Pusatere, that the Vessel had developed a list, which he stated was affecting the supply of lube oil to and the functioning of the engines.

56.     At 5:59am EDT on October 1, 2015 the late Captain reported flooding through an open scuttle in the third hold, which he opined was due to "the force of the water perhaps" (comment at 7:07am EDT).

57.     At 6:13am EDT the Vessel, due to the serious list, was said to have lost propulsion with the late Captain stating: "I think we just lost the plant."

58.     At 6:45am EDT the late Captain telephoned TOTE to report that "we got some flooding down in the hold" and "the engineers are tryin' to get the plant back."

59.     By 7:07am EDT the late Captain advised the crew had secured the scuttle.

60.      At 7:10am EDT the late Captain advised that the Vessel had a list of "ten to fifteen degrees but a lot of that's with the wind heel".

61.      At 7:14am EDT the late Chief Mate advised the late Captain that "something hit the fire main. Got it ruptured." This was followed by the late Chief Mate saying at 7:18am EDT that "the water level's too high" and the late Captain asking "what option do we have to close that valve so we don't have a free communication with the sea?"

62.      At 7:27am EDT the late Captain rang the Vessel's general alarm. At 7:31am EDT the late Captain ordered all personnel to abandon ship.

63.      At 7:39am EDT on October 1, 2015, the Vessel's Voyage Data sender ceased recording. The Vessel was ultimately located on the sea floor.

## FIRST CAUSE OF ACTION

## STRICT LIABILITY – DESIGN DEFECT

64.      Plaintiffs incorporate herein by reference the allegations of paragraphs 1 through 62 above and all of the allegations below.

65.      Defendant AWT designed, manufactured, distributed, was in the business of selling, and sold the BVS 7 to TOTE. AWT's BVS 7 was defectively designed, as it did not perform as safely as an ordinary consumer of such services would have expected it to perform. The Defendant AWT knew that BVS 7, if used as provided to TOTE, posed significant danger to the user of the product. The BVS 7 provided delayed, inaccurate, and misleading information to the Vessel about the position of the storm and was a substantial factor in the Vessel sailing nearly directly into the eye of the Hurricane, thereby destroying all cargo onboard. The risks of the BVS 7 Product design could have been significantly reduced by the adoption of a reasonable alternative design.

25

66.     The BVS Product reached TOTE and the EL FARO without substantial change in the condition in which it was sold.

67.     By reason of the foregoing, the Defendant has caused damage to Plaintiffs, and to the others on whose behalf Plaintiff sues, in an amount, as nearly as can now be estimated, up to U.S. $7,000,000.

## SECOND CAUSE OF ACTION

## <u>STRICT LIABILITY – MANUFACTURING DEFECT</u>

68.     Plaintiffs incorporate herein by reference the allegations of paragraphs 1 through 66 above and all of the allegations below.

69.     Defendant AWT designed, manufactured, distributed, was in the business of selling, and sold the BVS 7 to TOTE. The Defendant knew that BVS 7, if used as provided to TOTE, posed significant danger to the user of the product and to the cargoes that they carried. Due to a manufacturing defect, on or about 0500 EDT on September 30, 2015, the BVS 7 provided even further outdated, inaccurate, and misleading information to the Vessel concerning the position of the storm then it had previously and this too was a substantial factor in the Vessel sailing nearly directly into the eye of the Hurricane, thereby destroying all cargo onboard. Said Product departed from its intended design when it reached the EL FARO at 5:00am EDT on September 30, 2015 in that it had not downloaded the then current NHC storm track but instead an out of date and erroneous projected track.

70.     The BVS Product reached TOTE and the EL FARO without substantial change in the condition in which it was sold.

71.     By reason of the foregoing, the Defendant has caused damage to Plaintiffs, and to the others on whose behalf Plaintiff sues, in an amount, as nearly as can now be estimated, up to U.S. $7,000,000.

### THIRD CAUSE OF ACTION

### STRICT LIABILITY – FAILURE TO WARN

72.     Plaintiffs incorporate herein by reference the allegations of paragraphs 1 through 70 above and all of the allegations below.

73.     Defendant AWT designed, manufactured, distributed, was in the business of selling, and sold the BVS 7 to TOTE. TOTE lacked sufficient instructions or warnings of potential risks associated with relying on the BVS 7 information. The Defendant knew, or based upon the scientific knowledge generally known and accepted in the scientific community, or knowable at the time of the sinking, should have known, that BVS 7, if used as provided to TOTE, or misused in a reasonably feasible way, posed substantial danger to the user of the product and to the cargoes that they carried. AWT nonetheless failed to adequately and effectively warn TOTE (in particular its Captains such as the late Captain Davidson) of the substantial danger of relying upon the BVS 7 Product or that the BVS 7 provided delayed, inaccurate, and misleading information to the Vessel about the position of major storms generally, and about the position of the Hurricane. AWT's failure to properly so warn was a substantial factor in the Vessel sailing nearly directly into the eye of the Hurricane, thereby destroying all cargo onboard. The foreseeable risks of the harm caused by the BVS 7 Product could have been significantly reduced by or avoided by the provision of reasonable instructions or warnings by AWT, and the omission of these instructions rendered the product not reasonably safe.

27

74.     The BVS Product reached TOTE and the EL FARO without substantial change in the condition in which it was sold.

75.     By reason of the foregoing, the Defendant has caused damage to Plaintiffs, and to the others on whose behalf Plaintiff sues, in an amount, as nearly as can now be estimated, up to U.S. $7,000,000.

## FOURTH CAUSE OF ACTION

## <u>NEGLIGENCE</u>

76.     Plaintiffs incorporate herein by reference the allegations of paragraphs 1 through 74 above and all of the allegations below.

77.     Defendant AWT designed, manufactured, distributed, was in the business of selling, and sold the BVS 7 to TOTE. Defendant did not exercise reasonable care and was negligent in manufacturing, distributing and selling this product, given its known and/or obvious design and, on the one occasion referred above, at 5:00am EDT on September 30, 2015, manufacturing defects. The Defendant knew or should have known that BVS 7, if used as provided to TOTE, posed significant danger to the user of the product and to the cargoes that they carried. The BVS 7 provided delayed, inaccurate, and misleading information to the Vessel about the position of major storms generally and of the Hurricane, and was a substantial factor in the Vessel sailing nearly directly into the eye of the Hurricane, thereby destroying all cargo onboard.

78.     The BVS Product reached TOTE and the EL FARO without substantial change in the condition in which it was sold.

79.     By reason of the foregoing, the Defendant has caused damage to Plaintiffs, and to the others on whose behalf Plaintiff sues, in an amount, as nearly as can now be estimated, up to U.S. $7,000,000.

## FIFTH CAUSE OF ACTION

## <u>NEGLIGENCE – DUTY TO WARN</u>

80.     Plaintiffs incorporate herein by reference the allegations of paragraphs 1 through 78 above and all of the allegations below.

81.     Defendant AWT designed, manufactured, distributed, was in the business of selling, and sold the BVS 7 to TOTE. The Defendant knew that the BVS 7, if used as provided to TOTE, or even misused in a reasonably feasible manner, posed significant danger to the user of the product and to the cargoes that they carried. Defendant reasonably should have known that TOTE would not realize the danger; yet, they failed to adequately and effectively warn TOTE (in particular its Captains, such as the late Captain Davidson) of said danger. The BVS 7 provided delayed, inaccurate, and misleading information to the Vessel about the position of major storms generally and of the Hurricane and was a substantial factor in the Vessel sailing nearly directly into the eye of the Hurricane, thereby destroying all cargo onboard. A reasonable designer, manufacturer, distributor or seller of the product under similar circumstances would have warned of this danger. The foreseeable risks of the harm caused by the BVS 7 Product could have been significantly reduced by or avoided by the provision of reasonable instructions or warnings by AWT, and the omission of these instructions rendered the product not reasonably safe.

82.     The BVS Product reached TOTE and the EL FARO without substantial change in the condition in which it was sold.

29

83.     By reason of the foregoing, the Defendant has caused damage to Plaintiffs, and to the others on whose behalf Plaintiff sues, in an amount, as nearly as can now be estimated, up to U.S. $7,000,000.

## SIXTH CAUSE OF ACTION

## IMPLIED WARRANT OF MERCHANTABILITY

84.     Plaintiffs incorporate herein by reference the allegations of paragraphs 1 through 82 above and all of the allegations below.

85.     TOTE purchased the BVS 7 from Defendant AWT. At the time of the purchase, AWT was in the business of selling weather and hurricane data and storm track forecasting applications, among other products.

86.     AWT impliedly warranted that the BVS 7 was fit for the ordinary purposes for which such products are used, when in fact it was not, nor was it of the same quality as those equally accepted in the shipping trade. The BVS 7 provided delayed, inaccurate, and misleading information to the Vessel about the position of major storms generally and of the Hurricane, and the BVS 7's failure to have the expected quality of forecasting and data accuracy was a substantial factor in the Vessel sailing nearly directly into the eye of the Hurricane, thereby destroying all cargo onboard.

87.     By reason of the foregoing, the Defendant has caused damage to Plaintiffs, and to the others on whose behalf Plaintiff sues, in an amount, as nearly as can now be estimated, up to U.S. $7,000,000.

## SEVENTH CAUSE OF ACTION

## IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE

88.    Plaintiffs incorporate herein by reference the allegations of paragraphs 1 through 86 above and all of the allegations below.

89.    TOTE purchased the BVS 7 from Defendant AWT. At the time of the purchase, AWT was in the business of selling weather and hurricane data and storm track forecasting applications, among other products. Also at the time of the purchase, AWT knew or had reason to know that TOTE intended to use the BVS 7 for the purpose of planning out routes for its vessels to avoid major storms based on the weather and hurricane data and tracks gathered from the product and impliedly warranted its fitness for that purpose. At the time of TOTE's purchase, AWT knew or had reason to know that TOTE was relying on AWT's skill and judgment to select or furnish a product that was suitable for this particular purpose. TOTE, by its late Captain, justifiably relied upon AWT's skill and judgment in creating BVS 7.

90.    The BVS 7 was neither fit nor suitable for the purpose for which AWT sold it and TOTE used it. On the contrary, the BVS 7 provided delayed, inaccurate, and misleading information to the Vessel about the position of major storms generally and the Hurricane, and was a substantial factor in the Vessel sailing directly into the eye of the Hurricane, thereby destroying all cargo onboard.

91.    By reason of the foregoing, the Defendant has caused damage to Plaintiffs, and to the others on whose behalf Plaintiff sues, in an amount, as nearly as can now be estimated, up to U.S. $7,000,000.

WHEREOF, Plaintiff prays:

1.      That process in due form of law may issue against the Defendant citing them to appear and answer all and singular the matters aforesaid;

2.      That judgment may be entered in favor of Plaintiff against Defendant on each of the Causes of Action for the amount of Plaintiff's damages, together with interest and costs and the disbursements of this action;

3.      That this Court will grant to Plaintiff such other and further relief as may be just and proper.

Dated: June 16, 2017

                                             Respectfully submitted,

                                             s/David T. Maloof_____
                                             David T. Maloof, Esq. (*pro hac vice*)
                                             Thomas M. Eagan, Esq. (*pro hac vice*)
                                             MALOOF BROWNE & EAGAN, LLC
                                             411 Theodore Fremd Ave., Suite 190
                                             Rye, New York 10580
                                             Tel: (914) 912-1200
                                             Fax: (914) 921-1023
                                             Emails: dmaloof@maloofandbrowne.com
                                                       teagan@maloofandbrowne.com

                                             HORR NOVAK & SKIPP P.A.
                                             Brian T. Scarry, Esq.
                                             Florida Bar No.: 914230
                                             Two Datran Center, Suite 1700
                                             9130 S. Dadeland Blvd.
                                             Miami, Florida 33156
                                             Tel: (305) 670-2525
                                             Fax: (305) 670-2526
                                             Email: bscarry@admiral-law.com

*Attorneys for:* Great American Insurance Company of New York, QBE Seguros, Universal Insurance Company, Certain Underwriters And Insurers At Lloyds Of London Subscribing To Policy Of  Insurance Plc142719000, Certain Underwriters And Insurers At Lloyds Of  London Subscribing To Policy Of Insurance Lc151592500, Certain Underwriters And Insurers At Lloyds Of London Subscribing To Policy Of Insurance Lc1516254000, Certain Underwriters And Insurers At Lloyds Of London Subscribing To Policy Of Insurance Pc1412443000, Certain Underwriters And Insurers At Lloyds Of London Subscribing To Policy Of Insurance Lc1515551000, Certain Underwriters And Insurers At Lloyds Of London Subscribing To Policy Of Insurance Dc1500194000, Certain Underwriters And Insurers At Lloyds Of London Subscribing To Policy Of Insurance Dc1500466000, Certain Underwriters And Insurers At Lloyds Of London Subscribing To Policy Of Insurance Lc1515422000, Certain Underwriters And Insurers At Lloyds Of London Subscribing To Policy Of Insurance Lc1516397000.

F:\WP-DOCS\0701.91\AWT-StormGeo\Pleadings\Amended Complaint\Amended Complaint.doc